CM



# AFFIDAVIT IN SUPPORT OF SEARCH WARRANTS

JUL 1 7 2013

AT BALTIMORE
CLERK U.S. DISTRICT COURT
DISTRICT OF MARYLAND

I, Daniel E. Beresh, being first duly sworn, hereby depose and state as follows:

1.     I am a Special Agent with United States Immigration and Customs Enforcement (ICE), Homeland Security Investigations (HSI), and have been so employed since April 2003. I am presently assigned to the Office of the Special Agent in Charge, Baltimore, Maryland, where I am responsible for conducting criminal investigations involving the illegal exportation of goods and services from the United States. I have participated in the execution of search and arrest warrants in connection with the above mentioned investigations. Prior to my appointment with HSI, I was employed as a sworn peace officer in the State of Maryland for approximately seven years.

2.     This affidavit is being submitted in support of applications for search warrants for the electronic mail (email) accounts kamran5@verizon.net and nash20@verizon.net. The accounts are hosted by Verizon, Inc., located at 140 West Street, New York, New York. According to Verizon records, kamran5@verizon.net and nash20@verizon.net are enabled accounts created on or about December 05, 2005. Both accounts are subscribed to Kamran MALIK at 5720 Crain Highway, Upper Marlboro, Maryland.

3.     As set forth herein, I respectfully submit that there is probable cause to believe that the items sought by this search warrant constitute evidence of: 1) the unlawful export and attempted export of defense articles and services, and conspiracy to do the same, in violation of the Arms Export Control Act (AECA), 22 U.S.C. §§ 2778(b) and (c); 2) the unlawful export and attempted export of dual-use commodities, as those items are classified in the Export Administration Regulations (EAR), 15 C.F.R. Part 774, and conspiracy to do the same, in violation of the International Emergency Economic Powers Act (IEEPA), 50 U.S.C. § 1705; and 3) the unlawful

smuggling of goods from the United States, and conspiracy to do the same, in violation of 18 U.S.C §§ 554(a) and 371.

4.     I have personally participated in this investigation and have witnessed many of the facts and circumstances described herein. I have also received information from other federal law enforcement and intelligence officials relating to this investigation. The information set forth in this affidavit is based on my own observations and review of documents, or reliable information provided to me by other law enforcement personnel. I am setting forth only those facts and circumstances necessary to establish probable cause for the issuance of the requested search warrant. However, I have not omitted any fact which might tend to defeat a finding of probable cause. Unless otherwise indicated, all written and oral statements referred to herein are set forth in substance and in part, rather than verbatim.

## I.     Arms Export Control Act

5.     Pursuant to the provisions of the AECA, the President of the United States is authorized to control the export and import of defense articles and services, promulgate regulations with respect to their export, and designate those items so deemed. Those items designated to be defense articles and services are set forth on the United States Munitions List (USML). By virtue of the President's delegation of his authority under 22 U.S.C. § 2778, the Directorate of Defense Trade Controls (DDTC) within the Department of State (DOS) is charged with regulating the export and temporary import of defense articles and defense services covered by the USML in accordance with the provisions of the AECA and its implementing regulations, the International Traffic in Arms Regulations (ITAR) (22 C.F.R. Parts 120-130).

6.     Pursuant to 22 U.S.C. § 2278(b)(2), no defense articles or services designated on the

USML may be exported or temporarily imported without a license unless specifically provided by regulation. The ITAR states, in part, that any person who intends to export a defense article must first obtain approval from the DDTC. As such, an application for a permanent export license, known as a Form DSP-5 (Application/License for Permanent Export of Unclassified Defense Articles and Related Unclassified Technical Data), must be obtained prior to commencement of the export.

## II.   International Emergency Economic Powers Act

7.     Under the provisions of the Export Administration Act of 1979 (EAA), the President has the authority to prohibit or curtail the export of any goods, technology, or software as necessary to protect the national security, foreign policy, non-proliferation and short supply interests of the United States. Although the EAA expired on August 17, 2001, it has remained in force and effect through a series of Executive Orders issued by the President pursuant to his authority under the IEEPA to deal with any unusual and extraordinary threat to the national security, foreign policy or economy of the United States. See 50 U.S.C. §§ 1701-1706. By virtue of the President's delegation of his authority under the EAA, the Bureau of Industry and Security (BIS) within the Department of Commerce (DOC) administers the regulations governing the export of goods and technology, which are identified as the Export Administration Regulations (EAR) and codified at 15 C.F.R. Parts 73-774. Depending upon an item's technical characteristics, destination, end-user and end-use, certain dual-use commodities may not be exported or reexported to proscribed countries without a license issued by the BIS. Failure to obtain authorization for an export license required by EAR constitutes a violation of Section 764.2(a) of the EAR.

## III.   Probable Cause

### A.   Package Intercepted in Dubai

3

8.      On or about November 28, 2012, HSI Baltimore, along with the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), received information that the Dubai International Airport Police in the United Arab Emirates had confiscated a U.S.-origin parcel in transit to Pakistan after it was found to contain an array of M-4 carbine assault rifle components. The M-4 carbine is a shorter variation of the semi-automatic, shoulder fired, AR-15 assault rifle, which fires a .223 caliber ammunition round.

9.      According to shipping documents associated with the confiscated package, Charlie Jones of 4510 Lords Landing Road, Upper Marlboro, Maryland, was the shipper of record referenced under parcel tracking number 794148783819.  Additional shipper's information included the telephone number (301) 919-6777, which was subsequently determined to be subscribed to Waleed AFTAB at 4500 Lords Landing Road, Apartment 404, Upper Marlboro, Maryland. HSI Baltimore further learned the package, fraudulently manifested as "plastic cup holders" and "door springs," was originally consigned to a parcel shipping outlet located in Bowie, Maryland.

10.     On November 30, 2012, HSI Baltimore Special Agents interviewed the owner of the shipping outlet and an employee. The owner recalled that a long-haired adult male of Pakistani descent had shipped the package several days earlier to an address in Pakistan. The owner stated that AFTAB visited his business multiple times, on some occasions in the company of another individual. Based on further investigation outlined herein, your affiant believes this second individual was Kamran Ashfaq MALIK. The owner recalled several instances where AFTAB and the second individual shipped packages to Pakistan that were identified on shipping documents as either "plastic rope holders" or "plastic cup holders." The owner remembered one encounter where AFTAB and the second individual had a conversation in his presence about how to best describe the items on

4

shipping records and Customs forms. The owner produced several other shipping receipts with the alias "Charlie Jones," or the name "Kamran Malik" as the shipper of goods to Pakistan.

11.     Review of the shipping outlet's video surveillance system revealed that on or about November 26, 2012, AFTAB entered the store with a corrugated box that he paid to have delivered to Lahore, Pakistan. Upon reviewing the video in conjunction with HSI Baltimore agents, the owner of the shipping outlet positively identified AFTAB as the individual responsible for shipping the package later found to contain the M-4 firearm components. A photograph on file with the Maryland Motor Vehicle Administration (MVA) further corroborated AFTAB as the individual shown in the video.   The MVA records listed AFTAB's residential address as 4500 Lords Landing Road, Apartment 404, Upper Marlboro, Maryland. U.S. State Department passport records indicate that AFTAB is a United States citizen.

12.     In a follow-up interview on March 27, 2013, the owner and his employee, who routinely staffed the service counter in 2012, were shown a series of photographs to include images of AFTAB and MALIK. The owner positively identified AFTAB as the subject who shipped the package later seized by Dubai authorities. When shown a photograph of MALIK, the owner could neither discount nor positively identify MALIK as the second individual. The owner did however recognize MALIK as a frequent customer of his business and possibly the individual accompanying AFTAB.   The employee was also shown the series of photographs.   The employee could not positively identify AFTAB as the shipper of the seized items, but indicated his photograph did resemble the subject. The employee could not positively identify MALIK as the second subject, but did identify him as a frequent customer. The employee recalled several occasions where MALIK shipped packages to Pakistan alleged to contain "plastic cup holders." The employee acknowledged

assisting MALIK in carrying unused corrugated boxes purchased from the shipping outlet to MALIK's vehicle.

13.     An examination of the M-4 components confiscated in Dubai revealed that at least two items bore serialized numbers: a Colt M-4 lower receiver bearing serial number SP514438, and a Rock River M-4 lower receiver bearing serial number CM68208. Generally, the lower receiver on a rifle houses its mechanical parts, which enable the weapon to fire and are used to trace ownership of the particular firearm. A firearm trace requested from the ATF National Tracing Center revealed that the Colt Sporter M4 rifle was purchased by MALIK on July 29, 2012, from a federally licensed firearms dealer in Lorton, Virginia. A sales receipt obtained from the Virginia firearms dealer, and records from of a bank account opened in MALIK'S name, further corroborated that MALIK purchased the weapon. Records on file with the Maryland State Police indicated the Rock River Arms LAR-15 rifle was originally purchased from a Maryland firearms dealer on or about August 2007 and registered to a subject residing in Bowie, Maryland.

14.     On December 01, 2012, AFTAB was the subject of a Customs and Border Protection (CBP) outbound secondary examination at the John F. Kennedy International Airport port of entry as he was departing for a flight to Pakistan. A lawful border examination of AFTAB's carry-on luggage revealed that AFTAB was in possession of a purchase receipt from an on-line firearm accessories store located in Roaring Spring, Pennsylvania (hereafter referenced as Vendor A). According to the CBP officer, the receipt was dated September 24, 2012, and reflected a total purchase price of $854.63. When questioned about the transaction, AFTAB claimed he was a member of Vendor A's shooting range and had previously purchased and stored a Beretta PX-4 handgun at that location.

6

15.     HSI Baltimore subsequently obtained business records from Vendor A, including records for order number 1348353557. Review of that order form revealed Vendor A had sold six AR-15, 100 round, dual drum magazines with clear coverings to Amir ARIF on September 24, 2012. According to open sources, an AR-15, 100 round, dual drum magazine is designed to feed ammunition to the M-4 and M-16 assault rifles, including .223 caliber ammunition. Banking records associated with an account in ARIF's name confirmed that monies in the account were used to purchase the magazines. The shipping address identified by the purchaser was listed as 6802 Ben Franklin Road, Springfield, Virginia, with a billing phone number of (240) 210-6966, and a billing email address of kamran5@verizon.net. A review of telephone and Internet service provider records has since confirmed the phone number and email address are subscribed to MALIK.

16.     The order form was accompanied by a sales receipt dated September 24, 2012, in the amount of $854.63, the same date and dollar amount AFTAB claimed during his border interview was from the purchase of a Beretta PX-4 handgun. An extensive search of other orders from Vendor A for calendar year 2012 did not identify any purchases made by AFTAB. Physical surveillance of the premises occupied by Vendor A revealed a single family residence with no evidence of shooting range facilities. The proprietor of Vendor A subsequently confirmed the company is a home-based business that offers firearm-related accessories for sale, but not actual firearms. The business does not offer shooting range services, nor is the dwelling, located in a residential area in close proximity to other homes, equipped with such a facility.

17.     CBP records indicate that MALIK returned to the United States from Pakistan on or about March 07, 2013, at which time he was subjected to a secondary inspection by CBP officers at the point of entry. MALIK's phone and laptop were detained for examination by HSI pursuant to the

resulting border search. As set forth in more detail below, a review of email communications sent

and received over MALIK's cellular phone, and of information recovered from the seized laptop, has

revealed that MALIK engaged, over time, in a pattern of searching for and purchasing an assortment

of firearms, firearm magazines and other accessories through the Internet using his email addresses

kamran5@verizon.net and nash20@verizon.net. It appears that MALIK also used his phone to

photograph a number of the acquired weapons and accessories, which were purchased in the United

States and subsequently smuggled to Pakistan by AFTAB, MALIK and a third individual, identified

as Sajid MAHMOOD, a/k/a Shawn Chudhary, using a series of assumed names and fictitious

addresses to conceal their unlawful activities.

       18.     On March 26, 2013, HSI Baltimore accepted custody of the firearm components

seized by the Dubai Airport Police. Upon inventorying the contents of the shipment, the following

M-4 carbine assault rifle parts were identified:

| Line Item | Quantity | Description |
| --- | --- | --- |
| 001 | 3 | Hand Guard |
| 002 | 1 | Picatinny Rail |
| 003 | 1 | Carrying Handle |
| 004 | 1 | Aimpoint Optical Gun Sight |
| 005 | 2 | Butt Stock |
| 006 | 2 | Sling |
| 007 | 2 | Buffer Spring w/ Assembly |
| 008 | 1 | Lower Receiver SN: SP514438 |
| 009 | 1 | Lower Receiver SN: CM68208 |
| 010 | 2 | Charging Handle |
| 011 | 1 | TLR-2 LED Rail Mounted Flashlight with Laser SN: 082431 |
| 012 | 2 | Gas Tube w/ Front Sight |
| 013 | 1 | Sling Attachment |
| 014 | 1 | Ammunition Pouch |
| 015 | 1 | Fore grip Magazine Holder |
| 016 | 2 | Ammunition Magazines |
| 017 | 1 | Bolt Carrier |
| 018 | 1 | Bolt Carrier w/ Bolt Assembly |

| 019 | 2 | Pistol Grip |
| 020 | 1 | Colt Instruction Manual |
| | | Assorted Gun Cleaning Equipment |

19.     On April 12, 2013, the DDTC issued initial findings that all referenced firearm components seized in Dubai, to include the M4 lower receivers referenced in line items 008 and 009, are categorized under Article I(g) of the ITAR, and therefore require a valid State Department license prior to export. The DDTC also determined that AR-15, 100 round, dual drum magazines require a license for export as the item is categorized under Article I(h) of the ITAR. An initial DDTC license history check found no indication that MALIK, AFTAB, MAHMOOD, or name variations thereof, ever registered with the DDTC or applied for a license to permanently export any weapons and/or firearms-related components and accessories from the United States.

20.     The BIS also issued initial findings with regard to two other parts confiscated in Dubai: line item 004 - the Aimpoint CompM3 optical gun sight, and line item 011 - the TLR-2 LED Rail Mounted Flashlight with Laser. The BIS determined that both items were controlled for export under Export Control Classification Number (ECCN) 0A987 and required a license to export to Pakistan. Moreover, an initial BIS license history check did not identify any license applications sought by the three subjects to export such a gun sight or laser light to Pakistan, or any other weapons and/or firearms-related components and accessories.

**B.     Purchases of Firearms and Components and Related Email Usage**

21.     A review of border crossing information on file with the CBP revealed that MALIK had previously visited Pakistan towards the end of 2011. Those records indicated that on December 13, 2011, MALIK departed the United States for Lahore, Pakistan, and was subsequently admitted through the Lahore port of entry on December 14, 2011. A review of all Firearms Transaction

Records (ATF Form 4473) retained by the previously mentioned Virginia firearms dealer from whom MALIK had purchased the confiscated Colt Sporter M4 rifle, revealed that MALIK had purchased a number of firearms prior to his departure to Pakistan.[1]  For example, on or about March 01, 2011, MALIK purchased a Beretta 92FS 9mm handgun, serial number M61639Z.  On or about September 23, 2011, MALIK purchased a Beretta 87 .22 caliber handgun, serial number C47381U. On or about October 30, 2011, MALIK purchased a Beretta 90 9mm handgun, serial number TX16418.  On or about December 12, 2011, MALIK purchased a Glock 9mm handgun, serial number SCY134.  In each instance, MALIK claimed to reside at 200 Rivers Bend Circle, Chester, Virginia, which is a suburb of Richmond, Virginia.  Immigration records indicate that this address is associated with an individual believed to be MALIK's uncle.

22.     On or about July 10, 2011, an individual identifying himself as Nachater Singh sent an email to an online firearm parts supplier from MALIK's email address, nash20@verizon.net.  The individual, whom your affiant believes was likely MALIK, stated, in part, "Looking for AK47 bolt w/ firing pin.  I need 100 of them if you can give me a price."  On or about July 11, 2011, a similar email was sent from nash20@verizon.net.  The email read, in part, "Looking for ak47 bolt with firing pin.  Need 50 of them if have any."  In this instance, the email identified "Ashfaq, Inc." and "Malik" as the sender.  Review of Articles of Incorporation on file with the State of Maryland indicate that MALIK incorporated Ashfaq, Inc., in 2006 to engage in a fast food business as a franchisee's of Jerry Systems, the parent company of Jerry's Subs and Pizza.

23.     CBP records indicate that MALIK returned to the United States from Pakistan on or

---

[1] The ATF Form 4473 is completed by all individuals prior to the purchase of a firearm from a licensed Federal Firearms dealer.  The form, which includes information about the firearms purchaser, such as citizenship, state of residency and criminal history, is utilized to initiate the National Instant Criminal Background Check System (NICS)

about April 24, 2012. A review of evidence seized from MALIK's cell phone during his most recent border search on March 07, 2013, and subpoenaed records from the above-referenced firearms dealer in Virginia, has revealed that in or about July 2012, a few months after his return to the United States, MALIK resumed purchasing firearms and significant volumes of related accessories. For example, the Colt Sporter .223 caliber rifle, Model 5.56, serial number SP514438, confiscated by the Dubai authorities was purchased by MALIK from the Virginia gun dealer on or about July 29, 2012.

24.     On or about July 30, 2012, MALIK's phone was used to photograph two individuals holding M-4 carbine rifles. One subject was identified as Majid Bashir, an associate and one-time employee of MALIK's at Jerry's Sub and Pizza in Upper Marlboro, Maryland. Wage and Earning Statements maintained by the State of Maryland, Department of Labor, Licensing and Regulations indicated Bashir was once employed by the fast food chain. Additionally, a photograph comparison on file with the Maryland MVA confirmed Bashir as one of the subjects posing with the rifle. The global positioning system (GPS) system on MALIK's cellular phone (240) 210-6966 indicated the pictures were taken at or near 4500 Lords Landing Road, Upper Marlboro, Maryland.

25.     On or about September 16, 2012, MALIK's phone was used to photograph a Colt M-4 assault rifle. Although the serial number was not visible, the GPS coordinates indicated the image was taken at or near 4500 Lords Landing Road, Upper Marlboro, Maryland.

26.     On or about September 22, 2012, monies in the bank account of an individual by the name of Amir ARIF were utilized to purchase four Surefire Gun Magazine Tactical (SGMT) AR-15,

---

by the Federal Bureau of Investigation (FBI).

100 round, dual drum magazines with clear covers from a Florida firearm accessories supplier (hereafter referenced as Vendor B). The total purchase price was $573.14. The purchaser was identified as "Arif Amir" and the shipping address was listed as 6802 Ben Franklin Road, Springfield, Virginia, which is ARIF's known address. The purchaser provided MALIK's phone number, (240) 210-6966, and email address, kamran5@verizon.net, for contact information. HSI Baltimore obtained records for ARIF's bank account that confirmed debit of the purchase price for the sale. On or about the same date, monies in ARIF's bank account were used to purchase four more AR-15, 100 round, dual drum magazines valued at $477.36 from a firearm accessories supplier in Fort Worth, Texas (hereafter referenced as Vendor C). Business records and shipping records obtained from Vendor C confirmed the sale and delivery. On or about September 24, 2012, the same account was utilized to fund the purchase from Vendor A of six AR-15, 100 round, dual drum magazines with clear covers for $854.63. MALIK's phone number, (240) 210-6966, and email address, kamran5@verizon.net, were provided to both Vendor A and C for contact purposes.

27.     A forensic examination of MALIK's seized laptop indicated that he used the web browser "Google Chrome" to access the Internet. Your affiant has been advised that Google Chrome offers a feature called "AutoFill." AutoFill assists in completing web-based electronic documents by allowing users to save personal contact information in the form of a profile, which can then be automatically populated into an online form. Google AutoFill data found on MALIK's laptop indicated that on or about September 22, 2012, the following profile was modified:

> Arif Amir
> 6802 Ben Franklin Road
> Springfield, Virginia 22150
> kamran5@verizon.net
> (240) 210-6966

The referenced information, including MALIK's phone number and email address, is identical to the information provided to Vendors A, B and C in September 2012 to purchase AR-15, 100 round, dual drum magazines. The saved data suggests that MALIK used ARIF's name and shipping information to purchase and ship dual drum magazines to Virginia, which has no restrictions on the capacity of ammunition magazines may hold.

28.     On or about September 26, 2012, MALIK purchased a Beretta PX4 9mm handgun, serial number PX1860V, from the Virginia gun dealer. HSI Baltimore obtained the related ATF Form 4473, the bill of sale maintained by the Virginia gun dealer, and a bank statement in MALIK'S name, all confirming that the purchase was made by MALIK. The Beretta PX4 handgun was the same make and model firearm AFTAB claimed he purchased from Vendor A during his December 01, 2012, outbound examination at JFK Airport.

29.     On or about September 27, 2012, MALIK purchased a mobile gun vise from a Michigan based company (hereafter referenced as Vendor D). Vendor D specializes in manufacturing gun vises specifically designed to build, disassemble, clean and maintain M-4/AR-15 style rifles. Bank records, business records obtained from Vendor D, and seized copies of information stored in MALIK's mobile phone confirmed that he purchased the equipment for $406.30. MALIK requested the company ship the vise to his business address at 5720 Crain Highway, Upper Marlboro, Maryland, and provided his email address kamran5@verizon.net. The Crain Highway address is the location of a Jerry's Sub and Pizza shop. On March 27, 2013, the Prince George's County Police Department encountered an employee of the shop wearing a name tag which read, "Shawn Chudhary." The subject informed the police officers the fast food restaurant

was owned by his brother, Kamran MALIK. When officers asked for identification, Chudhary presented a Government of Pakistan National Identification Card identifying him as Sajid MAHMOOD, a Pakistani national born December 16, 1981. MAHMOOD further provided a personal cellular phone number of (301) 642-1742. A search of Immigration records revealed a Warrant of Removal/Deportation was issued for MAHMOOD by ICE on September 28, 2005, and he is presently a wanted ICE fugitive.

30.     On or about September 29, 2012, MALIK's phone captured multiple photographs of an AR-15, 100 round, dual drum magazine. GPS coordinates indicated the pictures were taken at or near 4500 Lords Landing Road, Upper Marlboro, Maryland.

31.     A review of shipping records subpoenaed from the international parcel carrier used by AFTAB to ship the confiscated M-4 rifle components revealed a succession of shipments of goods to Pakistan associated with MALIK and/or AFTAB. On or about October 01, 2012, the name Kamran MALIK was utilized to ship a package weighing approximately 23 pounds, manifested as "thread holder," to Mujataba NUTT at 75 Q Nutt House Model Town, Link Road Lahore, Pakistan. The shipment was referenced under tracking number 799087535704. Although MALIK was not positively identified, the owner of the shipping outlet in Bowie, Maryland, recalled to HSI Special Agents that he observed AFTAB and a second individual, described as a Pakistani male in his late 30's wearing glasses, ship the package to Pakistan. The owner produced a shipping receipt listing MALIK as the shipper. Open source resources indicate an AR-15, 100 round, dual drum magazine consists of two plastic cylinder shaped containers joined by a detachable box magazine. The box portion of a drum magazine inserts into a firearm's magazine well, which allows ammunition to be loaded from the drums into the weapon's chamber and fired. A drum magazine may be broken down

14

into multiple parts for cleaning and reassembly, and the disassembled drums are consistent in size and shape to various types of industrial thread holders.

32.     On or about October 04, 2012, MALIK's email address nash20@verizon.net and user name, Amir Kamran Malik, were utilized to send a message to an Irving, Texas, company offering firearms and related accessories for sale (hereafter referenced as Vendor E). In the message, the sender wrote, "Hello sir I would like to order 15 100 round drum for ar15 with clear back. What kind of discount you can offer me?" On or about the same date, a representative from Vendor E emailed the user "Amir Kamran" asking for clarification on the quantity he wished to purchase and his location.

33.     On or about October 09, 2012, MALIK's name, using the address 4300 Lords Landing Road, Upper Marlboro, Maryland, was employed to ship a package weighing approximately 17 pounds, manifested as "lids, plastic holders and empty bags," to NUTT at the Model Town address in Lahore, Pakistan. The owner of the shipping outlet in Bowie, Maryland, advised HSI Special Agents that he had observed AFTAB and a second individual, meeting the physical description of MALIK, ship the package to Pakistan. The owner produced a shipping receipt listing MALIK as the shipper. Open source information from the Unites States Postal Service indicates that 4300 Lords Landing Road, Upper Marlboro, Maryland, is not a valid mailing address. The package was shipped under tracking number 799147769030. Information obtained from various distributors of AR-15, 100 round, dual drum magazines indicate each magazine comes with a nylon carrying bag. Dissembled dual drum magazines and the accompanying bag would be consistent in size and shape to lids, plastic holders and bags as described on the shipping documents.

34.     On or about October 12, 2012, MALIK purchased twelve SGMT AR-15, 100 round,

dual drum magazines with clear covers for $1,700.14 from Vendor B. A bill of sale obtained from Vendor B and banking records in MALIK's name confirmed the purchase was made by MALIK. MALIK provided 7011 Calamo Street, Suite B, Springfield, Virginia, as a shipping address. MALIK provided his cell phone number, (240) 210-6966, and email address, nash20@verizon.net, for contact information. SGMT magazines are the same high capacity style magazines previously purchased using ARIF's bank account on September 22, 2012, and consistent in size and shape of other AR-15, 100 round, dual drum magazines. Review of MALIK's banking records indicated he listed 7011 Calamo Street, Suite B, Springfield, Virginia as his mailing address in the fall of 2012. On May 28, 2013, Special Agents performed physical surveillance of 7011 Calamo Street and found a two-story commercial building occupied by multiple businesses. Although the building was divided into individual units, agents confirmed that a "Suite B" was not located within the building.

35.     On or about October 17, 2012, in response to Vendor E's e-mail from October 4th, MALIK, using nash20@verizon.net, wrote that he wanted to purchase twenty SGMT AR15 drum magazines with clear covers. MALIK later provided Vendor E with the Calamo Street shipping address. MALIK subsequently purchased twenty-two SGMT AR-15, 100 round, dual drum magazines from Vendor E on October 17, 2012. A commercial invoice and sales receipt obtained from Vendor E, and a bank statement in MALIK's name, established that MALIK purchased the magazines for $2,902.49.

36.     On or about October 22, 2012, a package weighing approximately 28 pounds, manifested as "thread holder," was shipped under MALIK's name to Mujataba NUTT at the Model Town address in Pakistan under tracking number 793899599768. The shipping address provided was the fictitious address of 4300 Lords Landing Road, Upper Marlboro, Maryland. As previously

16

referenced, open sources indicate disassembled dual drum magazines are consistent in size and shape of some thread holders.

37.     Records obtained from a Richmond, Texas, company (hereafter referenced as Vendor F) indicate that on or about October 23, 2012, MALIK attempted to purchase one Gas Piston Conversion Kit designed for M-4/16 rifles.  Records from MALIK's bank account suggest the transaction was fulfilled for a purchase price of $375.34.  Generally, M-4 rifles rely upon a direct impinged gas operating system to eject a spent cartridge case and chamber a new ammunition round. The kit purchased from Vendor F converts an M-4 gas operated system to a gas-piston system, allowing for reduced heat and less fouling of the gun's action.  MALIK provided a billing address of 7011 Calamo Street, Suite B, Springfield, Virginia, but gave a shipping address of his business at 5720 Crain Highway, Upper Marlboro, Maryland.  Although Vendor F's business records showed a confirmation of the order, number 100000544, had been emailed to kamran5@verizon.net, the vendor surmised the order was not honored, as the billing address and shipping address differed.

38.     On or about October 24, 2012, MALIK's mobile phone was used to capture multiple images of AR-15, 100 round, dual drum magazines.  The GPS system on the phone identified 4500 Lords Landing Road, Upper Marlboro, Maryland, as the approximate location where the pictures were taken.

39.     CBP records indicate that on or about October 25, 2012, MALIK departed the United States en route to Pakistan.  A copy of passport entry data indicated MALIK was admitted into Pakistan on or about October 26, 2012, through the Lahore port of entry.  On or about October 31, 2012, a package weighing approximately 14 pounds, manifested as "metal chain," was shipped under the name of "Fred Jones" at 4700 Lords Landing Road, Upper Marlboro, Maryland, to MALIK at

17

411-B Canal View Housing Society, Lahore, Pakistan. The telephone number (301) 919-6777 was listed as the sender's phone number, which according to phone records is subscribed to AFTAB. The package was shipped under tracking number 874726211830.

40. On or about November 06, 2012, a package weighing approximately 37 pounds, manifested as "empty bags," was shipped under the name of "Charlie Jones" at 4510 Lords Landing Road, Upper Marlboro, Maryland, to MALIK at the same Canal View Housing Society address in Pakistan. Again, AFTAB's telephone number (301) 919-6777 was listed as the sender's phone number. The shipment was delivered under tracking number 794014055587. Analysis of the package's dimensions and weight of 37 pounds was inconsistent with the manifested items, which would weigh relatively less. As such, it is your affiant's belief that the package more likely contained dual drum magazines, as opposed to empty bags, or even carrying bags for the magazines.

41. On or about November 13, 2012, a package weighing approximately 33 pounds, manifested as "plastic rope holders," was shipped under the name of "Charlie Jones" at 4510 Lords Landing Road, Upper Marlboro, Maryland, to Mujtaba NUTT at the Model Town address in Lahore, Pakistan. AFTAB's cell phone number was listed for the sender. The package was referenced under tracking number 794060696700. Another package was shipped to the same individual and address in Pakistan on November 19, 2012, weighing approximately 18 pounds and manifested as "plastic rope holders." The sender of the package was also identified as "Charlie Jones." The shipment was referenced under parcel tracking number 794108380859, and listed AFTAB's telephone number. The declared description of "plastic rope holders" in both instances would be consistent in the size and shape of disassembled dual drum magazines.

42. On or about November 21, 2012, MALIK received a text message on his mobile

18

phone from telephone number (301) 642-1742, with the contact name "Sajid Bro." The message contained the tracking number 794108380859, which is associated with the November 19, 2012, shipment. Subscriber records obtained for the telephone number indicated that it is subscribed to MALIK. As noted previously, MALIK's self-proclaimed brother, Sajid MAHMOOD, a/k/a Shawn Chudhary, identified this number as his personal cell phone number to the PG County Police on March 27, 2013. The service provider's records for the phone number indicate that MALIK provided the email address shawnchudhary@yahoo.com as an alternate form of contact.

43.     On or about November 26, 2012, a package weighing approximately 14 pounds, manifested as "plastic cup holders and door springs," was shipped under the name of "Charlie Jones" at 4510 Lords Landing Road, Upper Marlboro, Maryland, to Mujtaba NUTT at the Model Town address in Pakistan. The shipment was recorded under parcel tracking number 7941048783819. It was this package that was subsequently examined by the Dubai Airport Police on or about November 28, 2012, as referenced above, and found to contain M-4 carbine assault rifle parts, including the two aforementioned serialized M-4 lower receivers.

44.     On or about November 30, 2012, a text message was sent from MALIK's mobile phone to telephone number (301) 642-1742, which read, "Tracking number." On the same date, MALIK subsequently received a text message from that same phone number known to be used by MAHMOOD. The message consisted of the parcel tracking number associated with the seized weapon parts, 7941048783819. On or about December 27, 2012, MALIK'S phone captured images of an unidentified male subject posing with an M-4 carbine assault rifle equipped with a high capacity, dual drum magazine. GPS coordinates from MALIK's phone indicate that the photographs were taken at or near a region of the Canal View Housing Society, Lahore Pakistan.

45.     On or about March 05, 2013, MALIK'S phone captured images of an unidentified female subject posing with an M-4 carbine assault rifle equipped with a high capacity, dual drum magazine.  GPS coordinates indicated the photographs were taken at or near a region of the Canal View Housing Society, Lahore, Pakistan.

46.     In addition to the photographs already referenced herein, MALIK's cell phone was also found to contain pictures of several Beretta handguns in varying states of assembly.  Although firearm ownership was not able to be traced, fully assembled Beretta handguns bearing serial numbers 1188092 and BER419669Z, respectively, were depicted in several photos.  In other pictures, the Beretta handgun with serial number 1188902 was displayed in a disassembled manner.

## IV.     Conclusion

47.     It is your affiant's belief that the referenced email accounts were utilized by MALIK as a means to procure various firearm accessories for the purpose of smuggling those items from the United States to Pakistan.  Business records reviewed to date reflect various transactions in which a total of forty-eight 100 round dual drum magazines were acquired by, or on behalf of, MALIK.  In many instances, as noted herein, MALIK's two email addresses were utilized for communication with the sellers of the dual drum magazines that were purchased and exported.  Your affiant further believes MALIK, with the assistance of AFTAB and MAHMOOD, falsely manifested firearms and firearm accessories on shipping records, so as to avoid detection from Customs officials prior to their export to Pakistan.  Based upon the information above, your affiant believes there is probable cause to believe that the email accounts identified herein are being used by MALIK and others to circumvent U.S. export laws, and further that probable cause exists to believe that the contents of the aforementioned email accounts constitute fruits, instrumentalities and evidence of violations of 22

U.S.C. 2778(b) and (c), 50 U.S.C. § 1705, and 18 U.S.C. § 554(a), and conspiriacy to commit those offenses.  It is requested that the search of the email accounts encompass the time period beginning March 1, 2011, which is the first identified purchase of a firearm by MALIK as set forth herein, to the present.

48.     This warrant application is governed by 18 U.S.C. § 2703(a), which permits governmental entities to require disclosure of the contents of stored electronic communications pursuant to a search warrant.  Section 2703(a) further provides that such a warrant may be issued "by a court with jurisdiction over the offense under investigation."  Moreover, § 2703(c)(1)(A) and (c)(2), provide that, in addition to the contents of electronic communications, the government may obtain by means of a search warrant any remaining types of records and information, such as computer logs and subscriber information, pertaining to a subscriber of an electronic communication service or remote computing service.  Section 2703(c)(3) provides further that under such circumstances, no notice to the subscriber or customer is required.

49.     In order to ensure that agents search only those computer accounts and/or files described in Attachment A, this affidavit and application for a search warrant seeks authorization to permit employees of Verizon (hereinafter referred to as "the Internet Hosting Provider") to assist agents in the execution of this warrant.  To further ensure that agents executing this warrant search only those computer accounts and/or files described in Attachment A, the following procedures will be implemented:

a.     The agent executing the warrant shall affect service by any lawful method, including faxing the warrant (with the Internet Hosting Provider's consent) to the offices of the Internet Hosting Provider at the locations specified in the warrant.  Internet Hosting Provider's

personnel will be directed to isolate the account and files described in Attachment A.

      b.     In order to minimize the disruption of computer service to innocent third parties, Internet Hosting Provider's employees trained in the operation of computers will create an exact duplicate of the computer accounts and files described in Attachment A, including an exact duplicate of all information stored therein.

      c.     Internet Hosting Provider's employees will provide the exact duplicate in electronic form of the accounts and files described in Attachment A and all information stored in that account and files to the agent who serves this search warrant.

      d.     Upon receipt of this information, the search procedures outlined in Attachment B will be utilized to minimize, to the greatest extent possible, the likelihood that files or other information for which there is not probable cause to search are viewed.

     50.     Further, pursuant to 18 U.S.C. § 2705(b), it is requested that the Court enter an order commanding the Internet Hosting Provider not to notify any person, including the account subscribers, of the existence of the warrant as there is reason to believe that notification of the existence of the warrant will result in: (1) endangering the life or physical safety of an individual; (2) flight from prosecution; (3) destruction of, or tampering with, evidence; (4) intimidation of potential witnesses; or (5) otherwise seriously jeopardizing the investigation. The involvement of the targeted email account in the criminal activity set forth herein is not public. Based on my training and experience, I know that subjects of criminal investigations will often destroy digital evidence upon learning of the existence of an investigation involving them and/or their associates. Additionally, if the Internet Hosting Provider notifies anyone that a warrant has been issued to the targeted e-mail account(s), the targets of this investigation and other persons may seek to further mask their

13-1578SAG

identities and criminal conduct, thereby seriously jeopardize the ongoing investigation. Based upon

my training and experience, I have learned that individuals involved in criminal conduct, especially

those engaged in online activities, routinely search the Internet for criminal affidavits and search

warrants and disseminate them to other criminals as they deem appropriate, such as by posting them

publicly online. Premature disclosure of the contents of this affidavit and related documents may

compromise this ongoing investigation.

Your affiant has signed this document under oath as to all assertions and allegations

contained herein and states that its contents are true and correct to the best of his knowledge.

Daniel E. Beresh, Special Agent

Sworn and subscribed to before me this ___ day of July, 2013.

Stephanie A. Gallagher
United States Magistrate Judge

23

**13-1578SAG**

## ATTACHMENT A

### I.      Search Procedure

1.      The search warrant will be presented to the Internet Hosting Provider ("IHP") and its personnel, who will be directed to isolate those accounts and files described in Section II below;

2.      In order to minimize any disruption of computer service to innocent third parties, the IHP employees and/or law enforcement personnel trained in the operation of computers will create an exact duplicate of the computer accounts and files described in Section II below, including an exact duplicate of all information stored in the computer accounts and files described therein;

3.      The IHP employees will provide the exact duplicate in electronic form of the accounts and files described in Section II below and all information stored in those accounts and files to the agent who serves the search warrant; and

4.      Law enforcement personnel will thereafter, using procedures described in Attachment B of the Affidavit in Support of Search Warrant, review all information and records received from the IHP employees to determine the information to be seized by law enforcement personnel specified in Section III of Attachment A.

### II.      Files and Accounts to be Copied by the IHP Employees

1.      All electronic mail stored and presently contained in, or on behalf of, the following electronic mail addresses or individual account(s) -- kamran5@verizon.net and nash20@verizon.net – for the time period beginning March 1, 2011, to the present.

2.      All existing printouts from original storage of all of the electronic mail described above in Section II (1);

3.      All "address books" or other list of correspondents associated with account described above in Section II (1).

4.      All saved "chat" transcripts associated with account described above in Section II (1).

5.      All transactional information of all activity of the electronic mail address and/or individual account described above in Section II(1), including log files, dates, times, methods of connecting, ports, dial-ups, and/or locations;

6.      All business records and subscriber information, in any form kept, pertaining to the electronic mail address and/or individual account described above in Section II(1), including applications, subscribers' full names, all screen names associated with the subscribers and/or accounts, all account names associated with the subscribers, methods of payment, telephone

1

numbers, addresses, and detailed billing records; and

7.      All records indicating the services available to subscribers of the electronic mail address and/or individual account described above in Section II(1).

## III.   Information to be Seized by Law Enforcement Personnel

All electronic mail and files which are evidence, fruits, and instrumentalities of engaging in, and conspiring to engage in, the unlawful export and attempted export of defense articles and services in violation of 22 U.S.C. § 2278(b) and (c), the unlawful export of goods/commodities in violation 50 U.S.C. § 1705, and the unlawful smuggling of goods from the United States, and conspiracy to do the same, in violation of 18 U.S.C. § 554(a); to include the following:

a.      All electronic mail that identifies individuals or correspondents engaged in the unauthorized export and/or unlawful smuggling of defense articles, services, and goods/commodities from the United States;

b.      All electronic mail that evidences or identifies the means and methods by which the unauthorized export and/or unlawful smuggling of defense articles and services, and/or goods/commodities, from the United States has occurred or may occur in the future;

c.      All electronic mail that evidences or identifies the means of payment or financing of the unauthorized sale and/or export and/or unlawful smuggling of defense articles and services, and/or goods/commodities, from the United States;

d.      All electronic mail that evidences or identifies the means of shipping and/or smuggling out of the United States of any defense articles and services, and/or goods/commodities;

e.      All electronic mail that evidences or identifies the structure of any organization(s) that are involved in the unauthorized export and/or smuggling of defense articles and services, and/or goods/commodities, from the United States;

f.      All existing printouts from original storage which concern the categories identified in subsection III (a) through III (e); and

g.      All transactional and business records and information described above in subsections II(5) through (7).

2.      All "address books" or other list of correspondents.

3.      All saved "chat" transcripts that identify conduct specified in subsection III(a).

2

**13-1578SAG**

## ATTACHMENT B

### Description of Methods to be Used for Searching Computer-Related Items

This warrant authorizes the search of electronically stored information. The search shall be conducted pursuant to the following protocol in order to minimize to the greatest extent possible the likelihood that files or other information for which there is not probable cause to search are viewed..

With respect to the search of any digitally/electronically stored information seized pursuant to the instant warrant as described in Attachment A hereto, the search procedure may include the following techniques (the following is a non-exclusive list, and the government may use other procedures that, like those listed below, minimize the review of information not within the list of items to be seized as set forth herein):

    a.     examination of all the data contained in such computer hardware, computer software, and/or memory storage devices to determine whether that data falls within the items to be seized;

    b.     searching for and attempting to recover any deleted, hidden, or encrypted data to determine whether that data falls within the list of items to be seized;

    c.     physical examination of the storage device, including surveying various file directories and the individual files they contain to determine whether they include data falling within the list of items to be seized;

    d.     opening or reading portions of files in order to determine whether their contents fall within the items to be seized;

    e.     scanning storage areas to discover data falling within the list of items to be seized, to possibly recover any such deleted data, and to search for and recover files falling within the list of items to be seized; and/or

    f.     performing key word searches through all electronic storage areas to determine whether occurrence of language contained in such storage areas exist that are likely to appear in the evidence to be seized.

1